UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO.: 3:10-CV-164-TBR

RANDALL SCOTT WALDMAN, *et al.*                                              APPELLANT

v.

RONALD B. STONE                                                                APPELLEE

**MEMORANDUM OPINION**

This matter comes before the Court upon remand from the Sixth Circuit Court of Appeals. (Docket #72). The Sixth Circuit affirmed this Court's judgment but reduced the amount of compensatory damages from $1,074,374 to $650,776 and remanded the case for an apportionment of damages pursuant to K.R.S. 411.182. (Docket #72). Appellant Randall S. Waldman has filed a brief in support of his position. (Docket #87). Appellee Ronald B. Stone has filed a response. (Docket #88). Waldman has replied. (Docket #89). This matter is now ripe for adjudication.

PROCEDURAL HISTORY

The procedural history of this case is "tortured and contentious." (Docket #60). This action originated as an adversary proceeding in Ronald Stone's Chapter 11 bankruptcy. Stone claimed Randall Waldman and Bruce Atherton conspired to defraud Stone of his interest in Stone Tool & Machine, Inc. The bankruptcy court found in favor of Stone and awarded a judgment of approximately $3 million. *In re Stone*, 421 B.R. 401 (Bankr. W.D. Ky. 2009). This Court affirmed the bankruptcy court's decision. (Docket #21). The Sixth Circuit held the bankruptcy court exceeded its authority in entering final judgment on Stone's fraud claim. The Sixth Circuit affirmed in part, vacated in part, and remanded the case for the bankruptcy court to "recast its final judgment as to these claims as proposed findings of fact and conclusions of law."

1

*Waldman v. Stone*, 698 F.3d 910, 923 (6th Cir. 2012). The bankruptcy court did so. Waldman filed an objection to the bankruptcy court's proposed findings of fact and conclusions of law. This Court conducted a *de novo* review and entered judgment in favor of Stone in the amount of $3,074,374. (Docket #60). Waldman filed a second appeal to the Sixth Circuit Court of Appeals. The Sixth Circuit held this Court erred in awarding Stone $1,074,374 in compensatory damages and reduced that award to $650,776. The Sixth Circuit also held this Court erred in holding Atherton and Waldman jointly and severally liable. The Sixth Circuit remanded this case with instructions to apportion Stone's damages pursuant to K.R.S. 411.182. *Waldman v. Stone*, 599 F. App'x 569, 575 (6th Cir. 2015).

FACTUAL BACKGROUND

Ronald Stone founded Stone, Tool and Machine, Inc. ("STM"), a tool and machine fabrication business, in 1989. STM grew steadily, though not without experiencing financial difficulty. STM received financing from Fifth Third Bank, securing the loans with a lien on STM's assets and a second mortgage on Stone's house. While STM had assets exceeding $1,700,000, it also had over $1,000,000 in debt and struggled with payments. In 2004, STM began to experience serious cash-flow issues when it lost General Electric as a customer. STM fell delinquent in loan payments to Fifth Third Bank and in paying federal payroll taxes. Stone consulted an accountant and was referred to Bruce Atherton.

Now disbarred, in 2004 Bruce Atherton was a bankruptcy attorney in Louisville, Kentucky.[1] Atherton presented Stone with two potential sources of capital. The first option,

---

[1] The bankruptcy court disbarred Atherton from practicing before it. Atherton has pled guilty to a felony offense of accessory after the fact to conspiracy to commit mail and wire fraud and was permanently disbarred from the practice of law in Kentucky for misconduct unrelated to this case. *Atherton v. Kentucky Bar Ass'n*, 308 S.W.3d 197, 197 (Ky. 2010).

2

Mid America Capital Financing Group ("Mid America"), was a business in which Atherton was the CEO. The second option was financing through Waldman.

Randall Waldman was presented to Stone as a "white knight" who had helped other businesses struggling with cash flow. Unbeknownst to Stone, Waldman and Atherton had a preexisting and complicated relationship. In 2004, Waldman loaned $40,000 to Atherton's company Mid America. The terms of the repayment were punitive. Mid America was required to repay $50,000 within 90 days. An additional 10 percent would be charged every three days the loan was past due. Three members of Mid America, including Atherton, signed personal guarantees with liability up to $85,000. When Mid America defaulted, Waldman began collecting from Atherton. These payments were inconsistent and at least one check bounced. Atherton also paid Waldman, at least in part, out of Atherton's client escrow account. In all, Waldman collected $54,000 from Atherton on this debt while also filing suit against the other personal guarantors. Separately, Atherton's secretary borrowed $20,000 from Waldman to purchase a BMW. When the secretary defaulted, Waldman sent two associates to repossess the vehicle. Although this loan was undocumented and Atherton had no legal obligation to repay his secretary's loan, he nevertheless repaid $20,000 to Waldman.[2]

---

[2] The bankruptcy court provides additional detail regarding Atherton and Waldman's entanglements:

> Christie Jones, a former secretary of Atherton who was employed at his office during the conclusion of the auto loan transaction, testified by deposition that during her employment in 2004 and 2005, Waldman largely financed Atherton's law office operations. Waldman was one of the few clients Atherton deigned to talk to by phone or would see upon one of his frequent visits to the office. Ample evidence was submitted outlining Atherton's financial dependence on Waldman during this time period and it is clear to the Court there was financial incentive to both men in the acquisition of STM and its assets. *In re Stone*, 421 B.R. 401, 409 (Bankr. W.D. Ky. 2009).

In July, 2004, Atherton introduced Waldman and Stone to discuss a potential financing arrangement. Unbeknownst to Stone, Atherton had already provided Waldman with financial information regarding STM. Following this meeting Waldman began regularly visiting Stone at STM's offices to discuss the business venture.

STM filed for Chapter 11 bankruptcy on August 12, 2004. During the fall of 2004 and winter of 2005, Stone discussed financing options separately with Mid America and with Waldman. Mid America initially proposed a sixty/forty ownership split to Stone, which Stone interpreted as sixty percent ownership for him. When Mid America corrected Stone that he would only own forty percent of STM, he cooled to the deal. When Waldman learned that Stone was discussing financing with Mid America he dissuaded Stone from pursuing that option, stating: "These guys couldn't rub two nickels together." (Trial Transcript, p. 2-137). Stone cut off negotiations with Mid America in February, 2005 after Mid America sent Stone an offer letter stating Stone would own 30 percent of STM. In March, 2005, Stone met with Waldman at a Waffle House and reached a tentative agreement for Waldman to purchase an interest in STM.

During this period Stone was not paying any of STM's debts per the instructions of Atherton.[3] Stone did make one payment of $13,000 to Fifth Third Bank, but Atherton became upset and yelled at Stone when he learned of this. Atherton explained to Stone that by not making payments STM improved its negotiating power over its creditors. Unbeknownst to Stone, Atherton intended for STM's assets to be sold at auction. Atherton incorporated new

---

[3] The bankruptcy court noted a litany of mistakes made by Atherton, such as filing the bankruptcy petition under the wrong name, filing inaccurate and incomplete schedules, failing to tender agreements with creditors to the bankruptcy court, failing to object to a motion to terminate the automatic stay, and in general making misrepresentations to the court. *In re Stone*, 421 B.R. 401, 410 (Bankr. W.D. Ky. 2009).

companies[4] for Waldman. Through these companies Waldman began negotiating directly with Fifth Third Bank to purchase all of STM's debts. Waldman twice approached Stone in a rush saying he needed a $10,000 check made out to cash. Waldman represented that this money was needed to stop Fifth Third Bank from foreclosing, but Waldman was actually using the money to buy additional time to negotiate for himself.

Waldman and Atherton represented to Stone that they were putting together a deal that would pay off STM's tax liens and Stone's credit card debt and second mortgage (both incurred on behalf of STM) and consolidate all of STM's debt. Following this reorganization, Stone would own 40 percent of STM and receive a five-year employment contract. The deal Waldman and Atherton arranged was significantly different. Instead of paying off STM and Stone's debts, Waldman purchased these debts for himself. To achieve this, Waldman used STM's assets as collateral for a new loan from Bullitt County Bank.

The deal closing occurred on May 20, 2005. Waldman called Stone and instructed him that he needed to pick up his wife and go to Atherton's office immediately. Upon arrival, Stone and his wife were presented with paperwork with the signature lines tabbed. When Stone asked to read the documents, Atherton informed him that there was not enough time because Atherton had to deliver these documents to prevent the foreclosure. After Stone and his wife signed, Atherton immediately left. Stone requested copies from Atherton as he was leaving, which Atherton confirmed he would provide. However, after the closing Atherton stopped returning Stone's calls.

Following the closing, Waldman owned the debt of STM. Atherton began working to transfer the assets of STM to Waldman as well. Fifth Third Bank had initiated a foreclosure

---

[4] RW. Ltd., Co. and Stone, Tool and Fabrication, Inc. later renamed Stone, Machine and Fabrication, Inc.

5

action against STM. Atherton represented STM and Stone in that case. After Waldman purchased STM's debts from Fifth Third Bank, Atherton entered an appearance on behalf of Waldman seeking a judicial sale of STM and Stone's assets, while still representing STM and Stone. The sale was held and Waldman was able to purchase the assets of STM for $650,000, using the debt purchased from Fifth Third Bank as credit for the purchase.

Stone was slow to realize what had occurred to him. At the time of the sale, Stone announced to STM's employees that Waldman was joining the firm as a partner. Stone and Waldman went to dinner for Christmas in lieu of taking bonuses. Stone continued to receive notices of his debt from Fifth Third Bank and his credit cards. Whenever he spoke to Atherton or Waldman about this, they told him that the banks were moving slowly in resolving the debt. In late 2005, Stone finally succeeded in obtaining a copy of the closing documents, not from Atherton directly, but from a secretary who left Atherton's office. However, Stone did not fully comprehend the documents and when he asked Atherton and Waldman about them, they said that the deal needed to be structured that way for the bankruptcy. Stone first became aware of what had occurred when he and Waldman had a disagreement about a business decision. Waldman informed Stone that Waldman was the sole owner and that at most he would consider selling a share of the company to Stone. Stone received confirmation when he attempted to refinance his home mortgage and found out that Waldman still held the second mortgage on his house. Stone confronted Waldman at their office and Waldman ducked the issue. Finally, in October, 2006, Waldman hired a new president for the company. Stone reacted violently to this development, throwing a chair, punching Waldman, and kicking a door off the hinges. Stone was terminated. Waldman filed suit against Stone to collect on the debts Waldman had acquired. This case arises out of Stone's bankruptcy.

STANDARD

A district court reviews *de novo* any portion of a bankruptcy court's proposed findings of fact and conclusion of law "to which any party has timely and specifically objected." 28 U.S. Code § 157(c)(1); Fed. R. Bankr. P. 9033(d); *see also Keats v. Council on Occupational Educ., Inc.*, 2012 U.S. Dist. LEXIS 173162 *11 (W.D. Ky. 2012) ("If the proceeding is non-core, the district court reviews both its factual findings and legal conclusions de novo"). This Court has conducted a *de novo* review of the full record, which is one made "without deference to the decision or any presumption of correctness." *Perry v. Simplicity Eng'g, Div. of Lukens Gen. Indus.*, 900 F.2d 963, 966 (6th Cir. 1990).

DISCUSSION

The Sixth Circuit has remanded this case with instructions to apportion Stone's damages pursuant to K.R.S. 411.182. The Court will first address (I) apportionment of damages among the parties. The Court will then address (II) whether the award of punitive damages should be amended in light of the Sixth Circuit's reduction of compensatory damages.

**I.     Apportionment of Damages.**

"In all tort actions," the finder of fact shall determine the "percentage of total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been release from liability." K.R.S. § 411.182(1). Fault may be allocated to all parties, including the plaintiff, to the extent each party was responsible for the injury. *Reece v. Dixie Warehouse & Cartage Co.*, 188 S.W.3d 440 (Ky. Ct. App. 2006). "In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at

fault and the extent of the causal relation between the conduct and the damages claimed." K.R.S. § 411.182(2); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815 (6th Cir. 2000).

The Court has considered an apportionment of fault among Atherton, Waldman, and Stone. For the following reasons, the Court apportions 50 percent of fault to Atherton, 50 percent of fault to Waldman, and 0 percent of fault to Stone.

Atherton's role in the fraud perpetrated against Stone is difficult to overstate. At the most fundamental level, Atherton worked on behalf of Waldman while representing to Stone that he was Stone's attorney. Atherton made numerous misrepresentations to Stone including about the progress of STM's bankruptcy, the contents of the closing documents, the urgency to sign these documents without reading them, the purpose of the judicial sale, and Waldman's status and ownership of STM. As Stone's attorney, Atherton stood in a position of trust and violated this trust as well as his ethical duties.[5] Atherton was able to take advantage of Stone because he presented himself to Stone as precisely what Stone most needed: a neutral, experienced advisor in an area where Stone had great need. It is not hyperbole to say that Atherton's involvement was essential for Stone to be defrauded, nor is it hard to imagine Stone being referred to another lawyer and avoiding the financial ruin that befell him.

While Atherton's role was indispensable, Waldman was no less active in the scheme to defraud Stone. Waldman concealed the fact that he was not paying off Stone and STM's debt but instead acquiring them for himself. Waldman, who lacked the experience necessary to run a machine shop, cultivated a false image in Stone's mind so that he would continue to operate STM. Waldman claims he did not profit because STM ultimately failed, but this ignores the fact

---

[5] A lawyer "shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." SCR 3.130(1.7)(b).

that at the time of the sale Waldman successfully transferred valuable equity in STM to himself. While the Court does not know the full extent to which Waldman exercised control over Atherton, it is evident that Waldman directly controlled or strongly influenced Atherton's actions. Most importantly, the Court finds that the conspiracy was conducted primarily for the benefit of Waldman.

The Court has considered whether Atherton or Waldman is primarily at fault in this case. In briefing, Waldman emphasizes Atherton's role in acting as legal counsel, conducting Stone's bankruptcy, forming the new legal entities, preparing the purchase documents, and hosting the closing at his office. (Docket #89). In comparison, Stone emphasizes Waldman's influence over Atherton, Waldman's false role as a "white knight," and the fact that Waldman primarily stood to benefit from the fraud. (Docket #88). The Court finds that both Atherton and Waldman played essential roles perpetrating fraud upon Stone. Atherton set the ball rolling by introducing Stone to Waldman and Atherton completed all of the legal steps to transfer STM to Waldman, but Waldman also actively participated in the fraud and stood to be the primary beneficiary. While Atherton violated his ethical duties as a lawyer to Stone, his client, Waldman violated his fiduciary duties to Stone, his business partner.[6] Therefore, the Court apportions 50 percent of the fault to Atherton and Waldman each.

The Court declines to apportion any fault to Stone. Waldman argues strenuously that Stone is at least partly responsible for his injuries because he was bullheaded and because he failed to read the closing documents. Waldman cites a case from this District that states: "if a party could have learned of the basis of the fraud, or if he could have uncovered it 'by ordinary vigilance and attention,' his failure to do so deprives him of a remedy." *Republic Bank & Trust*

---

[6] "That Stone and Waldman were partners, therefore, is reason enough to hold that Waldman owed Stone a fiduciary duty." *Waldman v. Stone*, 599 F. App'x 569, 575 (6th Cir. 2015).

9

*Co. v. Bear*, 707 F. Supp. 2d 702 (W.D. Ky. 2010) (*quoting Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. Ct. App. 1931). The *Republic Bank* case is distinguishable as it involves the sale of fifty million dollars worth of mortgage-backed securities between sophisticated banks. *See Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 258 (6th Cir. 2012) ("Republic, a sophisticated institutional investor, had a duty to read these documents, in the 'exercise of ordinary diligence'" ). It is also distinguishable because Republic Bank had an opportunity to review the prospectuses shortly after the sale and failed to do so. *Id*. (stating a "false representation" has "no legal effect" only when "the purchaser has *an opportunity to ascertain for himself such value by ordinary vigilance or inquiry*.") (emphasis in original) (citation omitted). Conversely, in this case Stone was neither a sophisticated party nor was he provided with a meaningful opportunity to review the closing documents. Although these documents were presented to him, Stone was urged by his attorney to sign them immediately. Thereafter, the documents were concealed from Stone and he did not receive a copy until Atherton's secretary sent him one without Atherton's knowledge. The Court finds that Stone recognized he lacked the financial and legal skills to arrange financing himself and prudently sought professional assistance. The Court does not find Stone was negligent in relying on this assistance or failing to uncover the conspiracy against him. Accordingly, the Court apportions no fault to Stone.

**II.     Punitive Damages.**

This Court previously awarded Stone $1,074,374 in compensatory damages and $2,000,000 in punitive damages. (Docket #60). The Sixth Circuit reduced Stone's compensatory damages to $650,776. (Docket #72). Waldman argues punitive damages should

be reduced in light of the Sixth Circuit's reduction of compensatory damages. Waldman also argues that punitive damages should not exceed a one-to-one ratio.[7] (Docket #87).

A "'district court possesses the power' to rectify its own mistakes." *White v. N.H. Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (quoting Fed. R. Civ. P. 59(e)). "If the trial court has entered an erroneous judgment, it should correct it." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 1219 (5th Cir. 1986) (*quoting* 5A J. Moore & J. Lucas, Moore's Federal Practice para. 52.11[2] (2d ed. 1985). It is "appropriate" for a court to amend an order "where the court has based an order on a factual error." *Norman v. Arkansas Dep't of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996); *Trustees of Painters Union Deposit Fund v. Harrison Const. Co.*, 2006 WL 374566 (E.D. Mich. 2006).

Waldman cites *Exxon Shipping Co. v. Baker* for the proposition that a one-to-one ratio is the "fair upper limit" for punitive damages. 554 U.S. 471 (2008). The *Exxon* court held that such a ratio is the "fair upper limit in *such maritime cases*." (emphasis added) *Id*. at 513. There is no "simple mathematical formula" for what ratio of punitive damages is excessive. *Bmw of N. Am. v. Gore*, 517 U.S. 559, 582 (1996). Instead, courts should analyze the "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the harm or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the remedy and the civil penalties imposed in comparable cases." *Fresh v. Entm't U.S.A., Inc.*, 340 F. Supp. 2d 851 (W.D. Tenn. 2003) (citing *Gore*, 517 U.S. 559). In general, "[s]ingle-digit multipliers are more likely to comport with due process." *State Farm Mut. Auto. Ins. Co. v.*

---

[7] Waldman also argues that no punitive damages should be imposed upon him. This Court has previously rejected this argument and found clear and convincing evidence to warrant punitive damages. (Docket #60).

11

*Campbell*, 538 U.S. 408, 425 (2003). "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id*.

This Court previously imposed punitive damages on a two-to-one ratio and held this ratio is within a "constitutionally acceptable range." (Docket #60). The Court believes that a two-to-one ratio for punitive damages will serve the "purpose to punish what has occurred and to deter its repetition." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991). In light of the reduction of compensatory damages from $1,074,374 to $650,776, the Court will reduce punitive damages from $2,000,000 to $1,200,000 and preserve the approximate two-to-one ratio previously employed by the Court. *See e.g. Fresh*, 340 F. Supp. 2d at 859-860 (reducing punitive damages from a twelve-to-one ration to a four-to-one ratio).

The Sixth Circuit also instructed this Court to "determine whether K.R.S. 411.182 also applies to Stone's award of punitive damages—an issue that neither party briefed on appeal." (Docket #72). K.R.S. 411.182(3) states that a "court shall determine the award of damages to each claimant in accordance with the findings . . . and shall determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault." K.R.S. 411.182(3). Waldman argues "if the Court awards punitive damages, they should be apportioned pursuant to K.R.S. § 411.182 under the same principles that determine each party's respective fault." (Docket #87). The Court agrees. Accordingly, the Court will apportion punitive damages in the same manner as compensatory damages, with 50 percent apportioned to Atherton and 50 percent apportioned to Waldman. The Court finds the conduct of Atherton and Waldman equally fraudulent and reprehensible.

## CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Ronald B. Stone in the amount of $650,776 in compensatory damages and $1,200,000 in punitive damages, with 50 percent of fault apportioned to Randall Waldman and 50 percent of fault apportioned to Bruce Atherton.

A separate judgment shall issue.